**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TODAY'S TDI, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | Civil Action No. 02-2168 |
| | ) | |
| v. | ) | Judge Cercone |
| | ) | Magistrate Judge Caiazza |
| MEDICINE SHOPPE | ) | |
| INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| Defendants/Counterclaim | ) | |
| Plaintiffs. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.   RECOMMENDATION**

It is respectfully recommended that summary judgment be granted in favor of the Defendants regarding the Plaintiff's claims, and in favor of the Plaintiff regarding the Defendants' Counterclaims.

**II.   REPORT**

From 1998 until May 2004, the Plaintiff Today's TDI, Inc. ("TDI") operated a "closed door" pharmacy from the basement of a Medicine Shoppe International, Inc. ("Medicine Shoppe") pharmacy in Crafton, Pennsylvania. *See generally* Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 63, hereinafter cited as "Defs.' Br.") at 1. The Medicine Shoppe location was being operated, pursuant to a licensing agreement, by Anthony A. Grejda ("Mr. Grejda"), who not coincidentally was the vast majority shareholder, secretary, treasurer, director and president of TDI.

*See generally* Defs.' Stmt. of Facts (Doc. 64) at ¶¶ 7-12. Medicine Shoppe was unaware of TDI's existence until late 2002, when state and federal law enforcement agents raided TDI's operations. *See generally* Defs.' Br. at 3.  Thereafter, the Defendant(s) seized control of the Medicine Shoppe facility, locking TDI out of the basement office. *See id.* at 2.

TDI initiated this action in state court, seeking to gain access to its operations in the Crafton basement. *See generally* Compl., attached to Notice of Removal (Doc. 1).  The case was removed to this court, and the Defendants filed Counterclaims for unfair competition, tortious interference with contract and/or prospective business relations, civil conspiracy, "alter ego," ejectment, and "punitive damages." *See generally* Countercls. (Doc. 5), Counts I-VII.  TDI thereafter regained access to its business operations, and the company now concedes that its underlying claims are moot. *See* Pl.'s Opp'n Br. (Doc. 67) at 1. Accordingly, this case proceeds only with Medicine Shoppe's claims against TDI.

Although belied by the substance of their pleadings, the Counterclaim Plaintiffs' theory at this juncture is simple enough.  Mr. Grejda, in violation of his licence agreement with Medicine Shoppe, surreptitiously created TDI to operate a closed door pharmacy out of the basement of the Crafton facility. *See generally* Defs.' Br. at 1.  In the process, Mr. Grejda and

-2-

TDI "engaged in unlawful and illegal activity"[1] resulting in pharmacy sales in excess of $75 million. *See id.* at 1, 8. The Counterclaim Plaintiffs want their cut. *See id.* at 16 (claiming entitlement, under license agreement with Mr. Grejda, to 5.5% of TDI's $75 million in revenues).

Any unseemliness to this approach notwithstanding, the Counterclaim Plaintiffs face a legal impediment to their recovery:  TDI was not a party to the license agreement between Mr. Grejda and Medicine Shoppe.[2]  As a result, the counterclaims comprise a strange consortium of tort-based theories and vicarious liability doctrines. *See generally* Countercls. None of them support the recovery sought.

Counterclaim Counts IV through VII may be quickly disposed of, as they do not constitute viable stand-alone causes of action.

As to Count IV, Pennsylvania law makes clear that civil conspiracy is "not [an] independently actionable" claim for relief; "rather, it is a means for establishing vicarious liability for [a separate] underlying tort."  *See* Boyanowski v.

---

[1]  On November 17, 2004, a Federal Grand Jury returned an Indictment against Mr. Grejda, charging him with eighty-four counts (84) of health care fraud, six (6) counts of mail fraud, fourteen (14) counts of wire fraud, and one (1) count of criminal conspiracy. *See generally* U.S. v. Anthony A. Grejda, *et al.*, Cr. Action No. 04-297 (W.D. Pa. 2004).  Mr. Grejda has pled not guilty, and the criminal charges remain pending.

[2]  Presumably, Mr. Grejda has not been joined here because he has filed for bankruptcy. *See* Pl.'s Opp'n Br. at 2; *see also* "Certificate of Commencement" of Chapter 11 proceedings in In re Anthony A. Grejda, Bankr. No. 02-33620 BM (W.D. Pa. Dec. 16, 2002) (attached as unnumbered exhibit to Compl.).

Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d Cir.)
(interpreting Pennsylvania law, citations and internal quotations
omitted), *cert. denied*, 531 U.S. 1011 (2000).

   The same is true of Count V, entitled "alter ego."
Neither this legal tenet, nor the Counterclaim Plaintiffs'
references to piercing the corporate veil, can provide an
independent basis for recovery.  *See* Peacock v. Thomas, 516 U.S.
349, 354 (1996) ("[p]iercing the corporate veil is not itself an
independent . . . cause of action, but rather is a means of
imposing liability on an underlying cause of action") (citation
and internal quotations omitted); *see also* Colorado Lawyer,
*The Alter Ego Doctrine in Colorado* (Mar. 1999) ("[a]lthough alter
ego . . . is often mistakenly pled as an independent cause of
action," it "rather is a means of imposing liability on an
underlying cause of action") (citing 1 Fletcher, Cyc. Corp. § 41
(perm. ed. rev. 1990)) (other citations omitted).

   Count VI, for ejectment, demands "immediate possession of
the entire Pharmacy premises."  *See* Countercls. at ¶ 73.
This claim is moot.  *See generally* discussion *supra*.  It also
goes without saying that Count VII, for "punitive damages,"
provides no independent basis for relief.

   Thus, the Counterclaim Plaintiffs are left with claims of
unfair competition (Count I), tortious interference with contract
(Count II), and tortious interference with prospective business
relations (Count III).

-4-

Regarding unfair competition, it is alleged that TDI unfairly traded on Medicine Shoppe's "name, trademarks, content and goodwill" and/or "created or increased confusion" between the companies, thereby "taking commercial opportunities that belong[ed] exclusively to Medicine Shoppe." *See* Countercls. at ¶¶ 45-47.  The Counterclaim Plaintiffs have presented no evidence, however, establishing that some or all of TDI's proceeds resulted from the company's trading under the auspices of Medicine Shoppe, and/or that TDI diverted customers from the pharmacy chain.  *See generally* Defs.' Br.; *see also id.* at 16 (seeking percentage of <u>all</u> TDI revenues, without identifying evidence that any business was attributable to or diverted from Medicine Shoppe); *cf.* Pl.'s Opp'n Br. at 4-5 (identifying evidence, with record citation, that Medicine Shoppe in Crafton did walk-in business, as contrasted with TDI's telephone and internet-based sales).  If the Counterclaim Plaintiffs ever possessed a viable claim for unfair competition, their current theory has abandoned it.

Similarly without merit are the claims for tortious interference with prospective business relations.  *See* Countercls., Count III.  The Counterclaim Plaintiffs allege Medicine Shoppe "had prospective business relations with [pharmacy] customers" and that TDI "prevent[ed] such business relations from occurring" and/or "diverted" the business to

itself.  *See id.* at ¶¶ 56-57.  As referenced above, no evidence
has been presented regarding the diversion of business from
Medicine Shoppe to TDI.  *See* discussion *supra*.  Even more
significant, however, is the Counterclaim Plaintiffs' failure to
identify a single prospective customer whose business was the
subject of interference.  Medicine Shoppe's "customers at large"
approach cannot be squared with the law.  *See* <u>Alvord-Polk, Inc.</u>
<u>v. F. Schumacher & Co.</u>, 37 F.3d 996, 1015 (3d Cir. 1994)
(for purposes of tortious interference, "[a] prospective contract
is something less than a contractual right, <u>[but] more than a</u>
<u>mere hope</u>"; "it exists [only] if there is a <u>reasonable</u>
<u>probability that a contract will arise from the parties' current</u>
<u>dealings</u>") (applying Pennsylvania law, some alterations in
original, citations and internal quotations omitted,
emphasis added), *cert. denied*, 514 U.S. 1063 (1995).

Last is tortious interference with contract.  The
Counterclaim Plaintiffs' theory is as follows.  TDI, who acted
through and possessed the knowledge of Mr. Grejda, was aware that
Mr. Grejda had a licence agreement with Medicine Shoppe.  *See*
Countercls. at ¶ 51.[3]  TDI, acting through Mr. Grejda, caused
Mr. Grejda to breach his contractual obligations with Medicine
Shoppe, thereby resulting in actual damage to the Counterclaim

_____

[3]  *See also* Defs.' Br. at 1, 6 (alleging Mr. Grejda "owned and operated" TDI
and that "[w]hatever knowledge Grejda had concerning" license agreement was
"obviously imputed to TDI").

Plaintiffs.  *See* Countercls. at ¶ 52.

This theory fails on many levels.  The Counterclaim Plaintiffs have not supported the proposition that Mr. Grejda, wearing his "corporate agent" hat, could interfere with Mr. Grejda, wearing his individual hat, in connection with the license agreement.  Metaphysics aside, this theory runs afoul of the rule that a party cannot tortiously interfere with his own contract.  *See* <u>Asirobicon, Inc. v. Rolls-Royce PLC</u>, 2003 WL 22071002, *8-9 (W.D. Pa. Sept. 5, 2003) (Caiazza, J.) (collecting cases), *Rpt. & Rec. adopted* (Ambrose, C.J. Nov. 12, 2003); <u>Werther v. Rosen</u>, 2003 WL 1861579, *2 (Pa. Comm. Pl. Apr. 2, 2003) ("a wholly owned corporation cannot be viewed as causing its sole controlling shareholder's breach of contract" because "[a party cannot] interfere[] with his own contract").

The tortious interference claim also breaks down under the "harm" and "actual legal damages" analyses.  *See generally* <u>Reading Radio, Inc. v. Fink</u>, 833 A.2d 199, 211 (Pa. Super. 2003) (discussing "harm [to] the existing [contractual] relation[s]" and "the occasioning of actual legal damage as a result") (citation omitted), *appeal denied*, 847 A.2d 1287 (Pa. 2004). Here, the grievants claim not that TDI caused Mr. Grejda to evade the payment of license fees based on sales generated at the Crafton Medicine Shoppe location.  Rather the Counterclaim Plaintiffs seek to recover a portion of TDI's closed door

-7-

revenues, revenues that would not have come into existence absent the very conduct of which Medicine Shoppe now complains.  Stated differently, the Counterclaim Plaintiffs' purported damages did not flow from Mr. Grejda's "failure to perform the contract." *See* <u>Judge Tech. Servs., Inc. v. Clancy</u>, 813 A.2d 879, 887 (Pa. Super. 2002) (citations, internal quotations, and emphasis omitted).  They flowed from a third-party's (*i.e.*, TDI's) generation of revenues.  The damages resulting from the purported interference with contract must be more than Medicine Shoppe's desire to share in TDI's profits, and the Counterclaim Plaintiffs' theory collapses under its own weight.

In sum, none of the above theories supports Medicine Shoppe's claimed entitlement to a portion of TDI's gross revenues.  If a vehicle for such recovery exists, the Counterclaim Plaintiffs have failed to identify it.

Even assuming recovery could be had, there appears no basis for recoupment of TDI proceeds beyond those proven to be diverted from Medicine Shoppe's business.  As seen above, no such evidence has been presented in this case.

Finally, if the Counterclaim Plaintiffs are sincere in their belief that TDI's conduct constituted "unlawful and illegal activity,"[4] the requested recovery is all the more suspect.

_____

[4]  *See* Defs.' Br. at 1; *see also* n.1 *supra* regarding Indictment filed against Mr. Grejda.

*Cf., e.g.*, 8 Williston on Contracts § 19:11 (4th ed. 2004)
("[a] contract which in itself is not unlawful . . . may
nevertheless be rendered void as against public policy
[if utilized] as part of a general scheme to bring about an
unlawful result").  If such a recovery otherwise could be had,
fairness considerations would suggest that Medicine Shoppe's
desire to share in the fruits of TDI's labors should be
accompanied by its willingness to share in the potential
liabilities.  *Compare* Pl.'s Opp'n Br. at 5 (highlighting evidence
that Counterclaim Plaintiffs rejected internet sales strategy as
too risky) *with* discussion *supra* at n.1 (highlighting Federal
Indictment charging Mr. Grejda with eighty-four counts of health
care fraud, six counts of mail fraud, fourteen counts of wire
fraud, and one count of criminal conspiracy).

     For all of the reasons stated above, each of the parties is
entitled to summary judgment regarding the claims stated against
it.  As for the entry of judgment in favor of TDI, the
undersigned believes that the Counterclaim Plaintiffs' Motion for
Summary Judgment fairly placed the matters above within the
court's consideration.  Technically, however, there is no motion
by TDI for summary judgment regarding the Counterclaims.

     Accordingly, the Counterclaim Plaintiffs hereby are given
notice of a recommended *sua sponte* ruling.  *See generally* <u>Roman
v. Jeffes</u>, 904 F.2d 192, 196 (3d Cir. 1990) (dispositive rulings

can be made *sua sponte*, provided litigants are afforded "notice and an opportunity to respond") (citations omitted).  Their opportunity to respond may be had through the course of their objections.  *See, e.g.*, <u>United States v. Lee</u>, 1998 WL 292388, *2 (10th Cir. May 28, 1998) (objections to report and recommendation provided party "ample opportunity to respond" to recommended *sua sponte* ruling).

        In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this report and recommendation are due by August 1, 2005.  Responses to objections are due by August 11, 2005.


July 14, 2005

                                                   _Francis X. Caiazza_
                                                   Francis X. Caiazza
                                                   U.S. Magistrate Judge

cc:

George L. Cass, Esq.
David J. Porter, Esq.
Buchanan Ingersoll
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA  15219

Paul A. Manion, Esq.
James R. Walker, Esq.
Manion, McDonough & Lucas
600 Grant Street, Suite 1414
Pittsburgh, PA  15219

H. Yale Gutnick, Esq.
Strassburger, McKenna, Gutnick & Potter
Four Gateway Center, Suite 2200
444 Liberty Avenue
Pittsburgh, PA  15222